IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| RICHARD BAIR, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | 2:07-cv-750 |
| v. | ) | Electronic Filing |
|  | ) |  |
| MICHAEL J. ASTRUE, | ) |  |
| COMMISSIONER OF SOCIAL | ) |  |
| SECURITY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Plaintiff Richard Bair ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act"). The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. For the reasons that follow, the administrative decision made by the Commissioner in this case will be vacated, and the case will be remanded to him for further proceedings.

**II. PROCEDURAL HISTORY**

Plaintiff protectively filed for SSI benefits on August 10, 2001. R. 287. The claim was initially denied on December 21, 2001, prompting Plaintiff to file a timely request for an administrative hearing on February 12, 2002. *Id.* On July 25, 2002, a hearing was held in Johnstown, Pennsylvania, before Administrative Law Judge Raymond J. Zadzilko. R. 485-523. In a decision dated February 10, 2003, Judge Zadzilko determined that Plaintiff was not statutorily disabled. R. 287-295.

On May 23, 2003, Plaintiff protectively filed a second application for SSI benefits, alleging disability as of May 1, 2003. R. 324-325. After the initial denial of the claim on October 21, 2003, Plaintiff filed a timely request for a hearing on December 10, 2003. R. 300-

304. An administrative hearing was held on November 10, 2004, before Administrative Law Judge Douglas W. Abruzzo (the "ALJ"). R. 524. Plaintiff, who was represented by counsel, appeared and testified at the hearing. R. 526-558. Dr. Joseph Bentivegna, an impartial vocational expert, also testified at the hearing. R. 558-565. In a decision dated December 10, 2004, the ALJ concluded that Plaintiff was not disabled under the Act. R. 19-30. The Appeals Council denied Plaintiff's request for review on December 8, 2006, thereby making the ALJ's decision the final decision of the Commissioner in this case. R. 14. Plaintiff commenced this action against the Commissioner on June 14, 2007, seeking judicial review of the Commissioner's administrative decision. Plaintiff and the Commissioner filed cross-motions for summary judgment on January 22, 2008, and March 24, 2008, respectively. These motions are the subject of this memorandum opinion.

### III. STATEMENT OF THE CASE

Plaintiff was born on May 12, 1959, making him forty-three years old at the time of his alleged onset of disability and forty-five years old on the date of the ALJ's decision. R. 29. This made him a "younger person" within the meaning of 20 C.F.R. § 416.963(c). He is a high school graduate. *Id.* From 1981 through 1985, Plaintiff served in the United States Air Force as a helicopter technician. R. 534. He later attended the Art Institute of Pittsburgh, graduating in 1998. R. 533. His past relevant work includes glass framer, roofer, graphic designer and typesetter jobs.[1] R. 558-559.

Plaintiff suffers from degenerative joint disease of the cervical spine, right shoulder bursitis, myofascial pain and depression. R. 29. His serious health problems began on May 13, 1993, when he sustained a work-related injury to his neck. R. 128. After seeing a worker's compensation doctor, Plaintiff sought treatment with Dr. S.P. Barua on June 25, 1993. *Id.* Plaintiff was suffering from an acute cervical strain with fibromyositis, and the range of motion in his neck was limited by forty percent in all directions. *Id.* A magnetic resonance imaging

---

[1]"Past relevant work" is defined as work that the claimant has done within the last fifteen years that constitutes "substantial gainful activity," and which has been performed for a sufficiently long period of time to enable the claimant to learn how to perform it. 20 C.F.R. § 416.960(b)(1).

("MRI") scan revealed that he had a bulging disc at C5-C6 and C6-C7, but there was no herniation. *Id.* This injury temporarily rendered Plaintiff unable to work. *Id.*

The record indicates that Plaintiff suffered a stroke in 1998. R. 172. He was unable to speak for two days. *Id.* Carotid Doppler studies yielded normal results. *Id.* Although Plaintiff's treating physicians wanted to conduct additional tests, Plaintiff apparently decided to leave the hospital against medical advice. *Id.* At the hearing before the ALJ, Plaintiff testified that he had refused to remain in the hospital because he did not want to miss his classes at the Art Institute of Pittsburgh. R. 537.

Additional health problems began to afflict Plaintiff in 2000. On January 30, 2000, Plaintiff sought treatment at Latrobe Area Hospital for what he believed to be a bleeding peptic ulcer. R. 159. The treatment notes indicate that the ulcer may have been induced by Plaintiff's consumption of alcohol. R. 159, 162. An endoscopy ultimately revealed that he was suffering from alcohol-induced gastritis. R. 171. His Helicobacter biopsy was normal. R. 204.

Plaintiff returned to Latrobe Area Hospital on September 2, 2000, complaining of chest pain. R. 172. This pain was completely relieved in the emergency room with sublingual Nitroglycerin. *Id.* Plaintiff testified that hospital personnel had informed him that he had suffered a heart attack. R. 534. Nevertheless, a cardiac catheterization yielded normal results. R. 181-182. Dr. Michael Milchak opined that Plaintiff's symptoms were most likely non-cardiac in etiology. R. 182.

Plaintiff continued to seek ongoing treatment for pain in his neck and back. R. 190-192. During the fall of 2001, Plaintiff underwent an x-ray of the cervical spine. R. 215. The x-ray revealed degenerative narrowing of the disc spaces at C5-C6 and C6-C7, with some anterior and posterior osteophyte at both levels. *Id.* Plaintiff was unable to extend his neck at that time. *Id.* As of May 14, 2002, his neck had lost about sixty percent of its normal range of motion. R. 245.

Plaintiff's wife suffers from bipolar disorder. R. 532. Because of his own physical ailments and his wife's mental impairments, Plaintiff began to suffer from depression. R. 246. His depression started to interfere with his appetite and sleep patterns. R. 268. The cumulative effects of such difficulties included a lack of energy, a loss of interest, and poor concentration.

*Id.* Plaintiff was prescribed Celexa to control his depression. R. 269. On April 3, 2003, it was noted that Plaintiff continued to suffer from depression. R. 386. He was only eating one meal per day, and he was generally unable to sleep at night. *Id.* He indicated that he had been getting a "high" from Celexa. *Id.* For this reason, he was told to switch his medication regimen from Celexa to Lexapro. *Id.*

On July 15, 2003, Dr. Barua completed a "medical source statement" concerning Plaintiff's ability to perform different work-related activities. R. 390-391. Dr. Barua opined that Plaintiff could sit, stand or walk for up to six hours in an eight-hour workday. R. 390. He indicated that Plaintiff could frequently lift or carry up to three pounds, occasionally lift up to twenty-five pounds, and occasionally carry up to ten pounds. *Id.* Dr. Barua further stated that Plaintiff could engage in only occasional bending, kneeling, stooping, crouching, balancing or climbing, and that he needed to avoid heights, temperature extremes and humidity. R. 391. On December 9, 2003, Dr. Barua completed another questionnaire concerning Plaintiff's ability to perform work-related activities. R. 440-445. Although the questionnaire is mostly illegible, it appears that Dr. Barua indicated that Plaintiff was only able to stand or walk for less than two hours in an eight-hour workday. R. 442.

Dr. Vito Dongiovanni performed a psychological evaluation of Plaintiff on September 8, 2003. R. 392. Dr. Dongiovanni previously examined plaintiff on October 30, 2001. He emphasized his familiarity with plaintiff and his history based on that prior examination and further emphasized that in his view the testing in and results from the current evaluation were valid. R. 392. He noted plaintiff had received ongoing mental health treatment in the form of medication and counseling from the Latrobe Mental Health Clinic. R. 393. Dr. Dongiovanni determined that Plaintiff was suffering from a major depressive disorder. R. 397. He assessed Plaintiff's Global Assessment of Functioning ("GAF") to be a score of 48. *Id.* He indicated that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions and slightly limited in his ability to carry out short, simple instructions. R. 399. He also opined that Plaintiff was moderately limited in his ability to interact appropriately with supervisors, co-workers and members of the public, and to respond appropriately to work

pressures and changes in a usual or routine work setting. *Id.*

On April 30, 2004, Plaintiff saw Dr. Diane Fox, complaining of neck pain and migraine headaches. R. 456. Because of his neck pain, Plaintiff continued to visit Dr. Barua on a periodic basis. R. 458-459. Plaintiff's headaches and neck pain apparently got so bad that, on one occasion, he went to the emergency room at Latrobe Hospital in order to seek relief. R. 458. He was given muscle relaxants. *Id.*

At the hearing, Plaintiff described the progression of his impairments. He testified that he had suffered a stroke while attending the Art Institute of Pittsburgh, and that he had refused to stay in the hospital because he did not want his health problems to interfere with his education. R. 537. He explained that while he had hoped to get a good job after finishing his schooling, his plans had been interrupted by a heart attack. *Id.* Plaintiff further testified that while he had been diagnosed with depression, he had always been reluctant to use aggressive medications for his mental problems because of the stigma associated with mentally ill persons. R. 537-538. He described persistent migraine headaches and disabling pain throughout his extremities. R. 539. He stated that he could not drive without his wife because he was unable to turn his neck enough to see "blind spots" on the road. R. 546.

## IV. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 108 S.Ct. 2541, 2545 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358,

360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his ultimate findings, an ALJ must do more than simply state factual conclusions. He must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is

6

determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corporation*, 332 U.S. 194, 196 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. DISCUSSION

In his decision, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. R. 28. Plaintiff was found to be suffering from degenerative disc disease of the cervical spine, right shoulder bursitis, myofascial pain and depression. R. 29. Although these impairments were deemed to be "severe" for purposes of 20 C.F.R. §§ 416.920(a)(4)(ii) and 416.920(c), the ALJ concluded that they did not meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listing of Impairments"). *Id.* In accordance with 20 C.F.R. § 416.945, the ALJ assessed Plaintiff's residual functional capacity as follows:

> The claimant has the residual functional capacity to engage in a range of sedentary work that involves occasional walking and/or standing, no more than two hours in an eight hour work day; no repetitive motions of the neck, such as rotations; occasional postural maneuvers, such as balancing, stooping, kneeling or climbing

> of ramps or stairs; no crouching, crawling or climbing of ladders, ropes or scaffolds; no overhead reaching with either upper extremity; no reaching above shoulder level or reaching below the knees; less than moderate exposure to cold temperatures, extreme wetness or humidity; no exposure to any unprotected heights, dangerous machinery or other similar work place hazards and no interaction with the general public.

*Id.* Given this assessment, it was determined that Plaintiff could not return to his past relevant work as a glass framer, roofer, graphic designer or typesetter. *Id.* Nevertheless, the ALJ concluded that Plaintiff could work as a television surveillance monitor, a stock inventory clerk, a scales operator or an order clerk. *Id.* Dr. Bentivegna's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 1382c(a)(3)(B). R. 562-563. Consequently, Plaintiff was found to be "not disabled" under 42 U.S.C. § 1382c(a)(3)(A). *Id.*

Plaintiff contends that the ALJ omitted limitations from his hypothetical question to Dr. Bentivegna. Doc. No. 12, pp. 7-9. This argument concerns Plaintiff's nonexertional limitations. It is axiomatic that the Commissioner is required to consider the cumulative effect of a claimant's exertional and nonexertional limitations in determining whether work exists in the national economy that is consistent with his or her residual functional capacity. *Burnam v. Schwieker*, 682 F.2d 456, 458 (3d Cir. 1982)("The fact that work exists in the national economy for a person who *only* has Burnam's exertional impairments, or for a person who *only* has his nonexertional impairments, does not mean that work exists in the national economy for a person who suffers from *both* types of impairments simultaneously.")(emphasis in original). In his opinion, the ALJ observed that Plaintiff's depression had resulted in nonexertional limitations, thereby requiring consideration of factors other than those relevant to claimants with only exertional limitations. R. 24. The ALJ went on to state that Plaintiff had "moderate" limitations in his activities of daily living, "moderate" limitations in his maintenance of social functioning, and "mild" limitations in his maintenance of concentration, persistence or pace. R. 24-25.

At the hearing, the relevant colloquy between the ALJ and Dr. Bentivegna occurred as follows:

> Q. Dr. Bentivegna, please assume for our discussion that we have a 45 year old person who has two years of college education, and has previous work in the construction industry as a glass framer and as a roofer and previous

work in the newspaper or publishing industry as a graphic design/typesetter. I would ask you to assume that this person is limited to a sedentary exertional level as that is defined in our Social Security Regulations. I am going to ask that you limit this person to only occasional walking and standing, which I define as no more than two hours out of an eight hour day. I would ask you to confine this person to occupations which do not require repetitive movement of the neck. What I am talking about is other than for example looking at a computer screen or video monitor I am talking about where you have to constantly change from one focus to another rotating the neck. Okay? I would ask you to limit this person to occasional postural maneuvers such as balancing, stooping, occasional kneeling, and this person must avoid all crouching, crawling, and climbing of ropes, ladders, scaffolds, etc. I want to limit the use of the person's ramps and stairs to only occasional. So let me go over that for you. I am saying occasional balancing, stooping, kneeling and use of stairs and ramps, but no crouching, crawling, ladders, ropes and scaffolds. Okay? I want you to limit this person to occupations which do not require overhead reaching, with either upper extremity. In fact, no reaching above the shoulders, nor reaching below the knees. I want you to limit this person to no, not even moderate, cold temperatures or extreme wetness or humidity. I don't want this person exposed to any unprotected heights, dangerous machinery, and other similar work place hazards. I want this person limited to no interaction at all with the general public required in the occupation. All right so let me go through it and make sure that you and I are on the same page. I am saying sedentary exertional level, occasional walking and standing, occasional balancing, stooping and kneeling and use of ramps and stairs, no crouching, crawling, rope, ladder or scaffold. No overhead, with either upper extremity, and no below the knees with either upper extremity. Avoid all, even moderate, exposure to cold temperatures, wetness and humidity. Avoid all exposure to dangerous machinery, unprotected heights, and similar work place hazards. Avoid all interaction with the general public and no repetitive motions of the neck, primarily rotation. Could that hypothetical person that I've just described perform the occupation of glass framer, roofer, or graphic design/typesetter?

A. My response to that your Honor would be no, the jobs in question are not sedentary as they indicate that a roofer is a very heavy type of job, and the other jobs are of a light nature. Restricting–restrictions to a sedentary job would exclude the possibility of performing the three jobs in question.

Q. All right sir. Then please assume that same hypothetical person 45 years of age, two year college education, with the same limitations that I just described. Are there sedentary jobs in either the national economy or a defined local economy which such a person could perform?

A. I believe I can make these suggestions within those restrictions and these are taken from the Johnstown Metropolitan Statistical Area Reports. They're sedentary, entry level, unskilled jobs. The first job I would suggest would be a TV monitor. This is a job primarily in a surveillance capacity. There are 119. The second one would be a stock inventory clerk. There are 208.

Q. Well now stock inventory I've always seen these people walking around with little computers. Is there a seated--

>    A. This is a clerk's job.
>
>    Q. Okay. All right. Good, and 108 you say?
>
>    A. Correct.
>
>    Q. Okay.
>
>    A. No 208, your Honor.
>
>    Q. Oh I'm sorry, 208.
>
>    A. The third would be a scales operator. There are 127. The fourth would be an order clerk. There are 198.
>
>    Q. Okay. That would not involve contact with the public?
>
>    A. No. No.

R. 560-562. It is apparent that the only non-exertional limitation presented to the vocational expert was a restriction of no interaction with the public.

Plaintiff is correct in arguing that a vocational expert's testimony is defective where the ALJ's hypothetical question fails to incorporate a limitation credibly established in the record. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). Nevertheless, the ALJ was not required to incorporate every limitation *alleged* by Plaintiff. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). The critical question is whether additional limitations were *credibly established* by the record. *Id.*

Dr. Dongiovanni performed a consultative psychological examination of Plaintiff in September 2003. R. 392-400. In his report, Dr. Dongiovanni commented on each of the factors relevant to the analysis required under the regulations. He reported as follows:

> ACTIVITIES OF DAILY LIVING:
>
> In terms of activities of daily living, as noted above, he does appear to perform his personal care, health and hygiene tasks independently, although at this point, they seem to be in need of improvement. There was a distinct body odor noted and his beard was long and unkempt. He does do the majority of the shopping, cooking, cleaning and some simple maintenance tasks at home, in addition to bill paying tasks. He noted that his wife suffers from "mental illness" and that he does the majority of these chores.
>
> SOCIAL FUNCTIONING:
>
> Social functioning is quite limited as he generally communicates little with the

> public overall, but does have a "few friends" with whom he does visit. Overall, however, he spends most of his day in his home.
>
> CONCENTRATION, PERSISTENCE AND PACE:
>
> Concentration, persistence and pace appear to be intermittent. He does seem to be able to attend fairly well to simple repetitive tasks, but he also displays signs that he can show difficulty with more complex tasks. His pace would be extremely slow in completing almost all tasks, however.

R. 397-398. Dr. Dongiovanni also indicated that Plaintiff was "slightly" limited in his ability to carry out short, simple instructions and "moderately" limited in his ability to understand, remember and carry out detailed instructions, make judgments on simple work-related decisions, interact appropriately with the public, supervisors or co-workers, and respond appropriately to work pressures or changes in a usual or routine work setting. R. 399.

As previously emphasized, the ALJ's residual functional capacity assessment, and corresponding hypothetical question to Dr. Bentivegna, included a limitation that Plaintiff have no interaction with the general public. R. 26. No accommodations were made for additional limitations noted in Dr. Dongiovanni's examination report. For instance, Dr. Dongiovanni found Plaintiff to be "moderately" limited in his ability to interact appropriately with *supervisors* and *co-workers* as well as in his ability to interact appropriately with the general public. R. 399. He also indicated plaintiff was moderately limited in responding to pressures and changes in the routine work setting.

Of course, an ALJ is free to reject medical evidence when it is contradicted by other medical evidence. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1999). But an ALJ is not free to employ his own expertise against that of an examining physician who has presented competent medical evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). And this principle is particularly forceful in the area of mental impairments where clinical and examining sources are based on an additional level of expertise. Morales, 225 F.3d at 317-18, 19 ("the principle that an ALJ should not substitute his lay opinion for medical opinion of experts is especially profound in a case involving a mental disability").

Here, the problem with the ALJ's assessment is that he essentially omitted virtually all of

the limitations found by Dr. Dongiovanni without relying on any additional medical evidence. There is no other competent medical or mental health treatment evidence which contradicted or undermined the results from Dr. Dongiovanni's consultative examination. The dismissal of this evidence in such a fashion is error and in any event it cannot under the circumstances supply the substantial evidence needed to support the decision below. *See Morales*, 225 F.3d at 317 (an ALJ may not reject competent medical evidence solely on the basis of his own "credibility judgments, speculation or lay opinion.").

The inadequacy of the ALJ's treatment of Plaintiff's nonexertional impairments is further underscored by the fact that Judge Zadzilko, in his opinion of February 10, 2003, determined that Plaintiff was limited to "low stress" jobs involving "simple, routine, repetitive tasks," which involved "*no* interaction with the public and *limited* interaction with co-workers or supervisors." R. 291 (emphasis added). Judge Zadzilko, of course, determined that Plaintiff was not statutorily disabled. R. 294. Thus, the Court cannot conclude, based on the current state of the record, that Plaintiff is disabled under the Act. Nevertheless, it is clear that there was no additional medical or mental health treatment evidence which would support a dismissal of these additional limitations and Judge Abruzzo simply was without justification to do so. Consequently, the proper remedy is for the Court to remand this case to the Commissioner for further administrative proceedings. *Stevens v. Commissioner of Social Security*, 484 F.Supp.2d 662, 668-669 (E.D.Mich. 2007).

Plaintiff also raises arguments concerning the ALJ's treatment of his GAF score. Dr. Dongiovanni gave Plaintiff a GAF score of 48. R. 397. A GAF score is used to report a clinician's judgment of an individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (Text Revision, 4th Edition), p. 32. A GAF score of 48 indicates serious symptoms, including serious impairment in one's social, occupational or educational functioning. *Id.*, p. 34.

At the hearing, the following exchange occurred between the ALJ and Plaintiff's counsel:

ATTY: Sir the treating physician Dr. Barilla, prepared an RFC indicating the Claimant would be off task 15 minutes every hour, the record repeatedly reflects complaints of pain and the CE's done by Dr.

>           Don GioVanni [phonetic] report concentration difficulties which
>           indicate he would be off task performing any type of job, and I
>           believe that the GAF scores reflected consistently over the last ten
>           years.
>
> ALJ:     Don't argue GAF to me. I absolutely ignore GAF. It is highly
>           subjective and of no value whatsoever in my opinion. Now if an
>           appellate court tells me I must consider the GAF, I will consider it
>           and say I think it stinks and I will return it to the appellate court.
>
> ATTY:    I know some Judges that do the opposite so. Okay, but now I
>           know. Now I know with you.
>
> ALJ:     I've just, you know, I've just had too much experience with that
>           and I just consider it to be just a wild guess.

R. 565-566. In his opinion, the ALJ made the following observations about the GAF score given to Plaintiff by Dr. Dongiovanni:

> The claimant's attorney specifically noted Dr. Dongiovanni's assessment that the claimant has a Global Assessment of Functioning (GAF) of 48 (Exhibit C-4F), suggesting serious limitations in functioning. However, the Administrative Law Judge affords little weight to this assessment because it is very subjective and reflects the claimant's perceived functional capacity during one brief period of time and is not necessarily indicative of his ability to function over sustained periods of time.

R. 28.

Plaintiff argues that the ALJ's comments at the hearing exhibit a bias against him, thereby requiring a different ALJ to be assigned to this case on remand. Doc. No. 12, pp. 10, 20.

A plaintiff can obtain a remand for a hearing before a different ALJ upon a showing that he or she has been subjected to unwarranted hostility or bias by a particular ALJ. *Ventura v. Shalala*, 55 F.3d 900, 904-905 (3d Cir. 1995). In the absence of showing bias, however, it is doubtful that this Court possesses the authority to require the reassignment of a case to a different ALJ on remand. *Travis v. Sullivan*, 985 F.2d 919, 923-924 (7th Cir. 1993). This Court is vested with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Congress has *not* given this Court the authority to oversee the conduct of Social Security administrative proceedings in a more general sense. That is the prerogative of the Commissioner. 42 U.S.C. § 405(b). Thus, it is up to the

13

Commissioner to decide how to administer Plaintiff's case on remand.

A related issue, of course, is whether the ALJ improperly discounted Dr. Dongiovanni's assessment of Plaintiff's Global Assessment of Functioning. There is no direct correlation between a claimant's GAF and the level of severity that an impairment must reach in order to render the claimant disabled under the Act. *Colon v. Barnhart*, 424 F.Supp.2d 805, 812 (E.D.Pa. 2006). Nevertheless, a GAF score, like any other medical evidence, must be considered by the ALJ. *Id.* It is an objective diagnostic measure used by those in the mental health field to signify a certain level of functioning.[2]

The Court is troubled by the ALJ's willingness to reject this form of competent mental health evidence summarily without countervailing medical evidence or other sound evidence for doing so. The ALJ's determination that such scores are "very subjective" and indicative of little more than a brief snapshot of a subject's lack of functioning is nothing more than an attempt to interject rank lay opinion in order to displace the import of a trained clinician's assessment after examination. Such reasoning does not constitute substantial evidence. *Morales*, 225 F.3d at 318 ( "[t]he ALJ cannot, as he did here, disregard [the import of the medical evidence] based solely on his own amorphous impressions, gleaned from the record, and from his evaluations of the claimant's credibility.") (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). It is imperative that whatever ALJ is assigned to this case on remand, he or she give serious consideration to *all* of the evidence contained in the record and accord objective medical and

---

[2]Dr. Dongiovanni assessed plaintiff's GAF score as 48 in February of 2003. As previously noted, a GAF score between 41 and 50 indicates:

> **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).

DSM - IV at 34.

diagnostic mental health evidence from treating and consulting sources its proper weight.[3]

Plaintiff relies on documentation from the Mental Health Center at Latrobe Area Hospital in support of his argument that the ALJ erred in determining that his nonexertional limitations did not preclude him from engaging in substantial gainful activity. Doc. No. 12, pp. 12-13. This documentation, however, cannot be considered by the Court in determining whether the ALJ's decision is supported by substantial evidence. The record indicates that the relevant documents were first submitted to the Appeals Council, which later denied Plaintiff's request for review. R. 7, 14, 17. Since the Appeals Council did not review the ALJ's decision, that decision became the final decision of the Commissioner. R. 14. In *Matthews v. Apfel*, 239 F.3d 589, 592-593 (3d Cir. 2001), the United States Court of Appeals for the Third Circuit construed the sixth sentence of § 405(g) to preclude a district court's consideration of evidence presented for the first time to the Appeals Council, which later denies a request for review, absent a showing of good cause on the part of the claimant as to why the evidence was not initially presented to the ALJ.[4] While the

---

[3] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports with great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429); *see also Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. *Gordils v. Secretary of Health and Human Services*, 921 F.3d 327, 328 (1st Cir. 1990) (citing *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. *See Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was only medical assessment on point and corroborated by other evidence). Similarly, examining physician's reports that rest on objective clinical test results may be entitled to significant or controlling weight. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

[4] The sixth sentence of 42 U.S.C. § 405(g) states as follows: "The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully

Courts of Appeals are divided on the question of whether such evidence can be considered at this stage, this Court is bound by the precedent set in *Matthews*.[5] Even though "evidence considered by the Appeals Council is part of the administrative record on appeal, it cannot be considered by the District Court in making its substantial evidence review once the Appeals Council has denied review." *Matthews*, 239 F.3d at 593.

In this case, Plaintiff makes no argument to the effect that he had "good cause" for not presenting the documents in question to the ALJ. Instead, he merely assumes that this Court can consider them. Doc. No. 12, pp. 12-13. Plaintiff could find no solace in these documents if a remand were not required for other reasons. Since a remand is necessitated in any event, however, the documents relied upon by Plaintiff should certainly be considered in the upcoming administrative proceedings.

## VI. CONCLUSION

Since the ALJ clearly omitted non-exertional limitations from Plaintiff's residual functional capacity that were credibly established by uncontradicted evidence, the administrative decision under review is not "supported by substantial evidence" for purposes of § 405(g). A remand for further administrative proceedings is required. Given this disposition, the Court need not address Plaintiff's arguments concerning the ALJ's treatment of his exertional impairments. Suffice it to say that the Commissioner, on remand, must adequately explain the weight given to the opinions expressed by all treating, examining and non-examining physicians. *Alejandro v.*

---

favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based."

[5]Compare *Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262-1267 (11th Cir. 2007), *Higginbotham v. Barnhart*, 405 F. 3d 332, 336-337 (5th Cir. 2005), *Perez v. Chater*, 77 F. 3d 41, 45 (2nd Cir. 1996), *O'Dell v. Shalala*, 44 F. 3d 855, 859 (10th Cir. 1994), *Ramirez v. Shalala*, 8 F. 3d 1449, 1452 (9th Cir. 1993), *Nelson v. Sullivan*, 966 F. 2d 363, 366 (8th Cir. 1992), and *Wilkins v. Secretary of DHHS*, 953 F. 2d 93, 96 (4th Cir. 1991) (en banc), (holding that evidence not submitted to the ALJ but later submitted to the Appeals Council, which later denies review, should be considered by the District Court), with *Matthews v. Apfel*, 239 F. 3d 589, 593-594 (3rd Cir. 2001), *Cotton v. Sullivan*, 2 F. 3d 692, 695-696 (6th Cir. 1993), and *Eads v. Secretary of DHHS*, 983 F. 2d 815, 817-818 (7th Cir. 1993), (holding that evidence not presented to the ALJ but later submitted to the Appeals Council, which later denies review, should not be considered by the District Court unless the claimant shows good cause for not having submitted the evidence to the ALJ). See also *Mills v. Apfel*, 244 F. 3d 1, 4-6 (1st Cir. 2001), (holding that an ALJ cannot be faulted for failing to consider unavailable evidence, but that "an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for its action.").

*Barnhart*, 291 F. Supp.2d 497, 508 (S.D. Tex. 2003).

Accordingly, the Court will vacate the Commissioner's determination that Plaintiff is not entitled to SSI benefits under Title XVI of the Act, and remand this case for further administrative proceedings consistent with this opinion. An appropriate order will follow.

Date: September 24, 2008

s/ David Stewart Cercone  
David Stewart Cercone  
United States District Judge

cc:   Karl E. Osterhout, Esq.
      1789 S. Braddock Ave., Suite 570
      Pittsburgh, PA 15218

      Jessica Lieber Smolar
      Assistant United States Attorney